Natalie Lyons, No. 293026
Vess A. Miller, No. 278020
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Tel.: (317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com

*Counsel for Plaintiff and the Proposed Class*
[*additional counsel listed on signature pages*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HOWARD CLARK, JR., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTENE CORPORATION and HEALTH NET, LLC,<br><br>Defendants. | **Case No.** _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **Negligence**<br>2. **Negligence Per Se**<br>3. **Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502**<br>4. **Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***<br>5. **Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100, *et seq.***<br>6. **Breach of Express and Implied Contract**<br>7. **Unjust Enrichment**<br>8. **Breach of Fiduciary Duty**<br>9. **Declaratory Judgment**<br>10. **Breach of Confidence**<br>11. **Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 631, *et seq.***<br>12. **Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632, *et seq.***<br>13. **Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638, *et seq.***<br>14. **Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.***<br>15. **Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(3)(a), *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Howard Clark, Jr., individually, and on behalf of all others similarly situated (hereinafter "Plaintiff") brings this Class Action Complaint against Defendants, Centene Corporation ("Centene") and Health Net, LLC ("Health Net" or "HN," and collectively with Centene, "Defendants"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows.

**INTRODUCTION**

1.      This case arises from a fundamental betrayal of trust. Defendants, major healthcare insurance providers, assured its health insurance customers and other website visitors that their private information would remain confidential. Through a cookie banner, Defendants represented that website visitors could opt out of cookies and data tracking. In the cookie banner on its website,[1] Defendants stated unequivocally: "You may choose which types of cookies to allow and can change your preferences at any time." These representations were false.

2.      In truth, Defendants embedded on their website tracking tools to share visitor information with third parties, including Meta/Facebook, Google, The Trade Desk, Adobe, Microsoft, LinkedIn, BidSwitch, Demandbase, Pubmatic, Salesforce, and Magnite (collectively the "Third Parties" and their "Trackers") without visitor consent, knowledge, or authorization (the "Disclosure").

3.      The Trackers embedded by Defendants intercepted visitors' communications and interactions in real time and shared those communications with the Third Parties. As a result, the Third Parties harvested sensitive, private information including visitor's browsing activities, the pages they viewed and the buttons they clicked, their status as medical patients and/or as insured individuals, their medical histories, the drugs they take, their anticipated consumption of medical services, their locations, additional information from their health insurance applications, and

---

[1] The banner appears immediately upon a visitor's first visit to Defendant's website. A visitor to the website may choose to "Decline," Accept," or view "Cookie Preferences"; when a visitor chooses "Cookie Preferences," Defendant makes the above representation that visitors may choose the types of tracking/cookies they accept. The cookie banner is displayed prominently and persists until the visitor clicks "Accept" or "Decline."

identifying information including IP addresses and identifying cookies.

4. Worse still, the supposed "opt-out" offered via the cookie banner was functionally meaningless. Regardless of the visitor's selection, tracking occurred. This was not just a breach of trust. Defendants' actions violated both California and Federal law.

5. By knowingly deploying these tracking technologies in violation of its own express assurances and without meaningful user consent, Defendants violated the California Invasion of Privacy Act ("CIPA") and fundamental expectations of privacy in healthcare. Plaintiff brings this action to hold Defendants accountable for their unlawful wiretapping and deceptive practices that left insurance customers and other visitors exposed – without warning, without choice, and without recourse.

6. A tracker (also referred to as "Tracking Technology" or "Tracker") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[2] When a person visits a website with a Tracker, the Tracker logs "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[3] Then, the Tracker transmits the event information back to the website server and to Third Parties, where it can be combined with other data and used for marketing.[4]

7. Third Parties like Meta, The Trade Desk, Google, Demandbase, Bidswitch, and Magnite use the data they collect from the Trackers to build individualized profiles of the visitors who browse the HN website. The Trackers from these Third Parties that Defendants installed on visitors' browsers include identifiers unique to each visitor. These unique identifiers are "cookies." On information and belief, the cookies remain installed on the visitor's browser even after the visitor navigates away from the HN website. Thus, because of HN's failure to honor the "Decline" button in its own cookie banner, Meta, The Trade Desk, Google, and additional Third Parties intercept and store information about the pages visitors view, the information they enter,

---

[2] *See Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/.
[3] *See Conversion Tracking*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.
[4] *Id*.

and the searches they perform, both on the HN website and elsewhere on the Internet.

8.      On information and belief, the Third Parties profit from the information they collect by selling targeted advertising space to advertisers, where "targeted" means that The Third Parties know specific facts about the visitor based on their browsing behavior, including searches they performed on and information they provided to the HN website. Some of the relevant third parties, including at least the The Trade Desk, also share the visitor browsing data with other third-party data brokers via a process known as "cookie syncing."

9.      Defendants harmed visitors by sharing sensitive and private healthcare information with undisclosed Third Parties even after HN explicitly promised *not* to do so. The Third-Party data brokers and advertisers then used each visitor's private health information to help build a personalized profile of that individual, for the purpose of selling interest-based targeted advertising. For example, when an individual informs Defendants that they are a tobacco user or a Viagra user while searching for health insurance on HN's website, Defendants share this information and an identifier unique to that visitor with Third Parties including The Trade Desk and Google. Via cookie syncing, The Trade Desk in turn shares the same information with additional data brokers and advertising platforms. Thus, because of HN's unauthorized disclosure, the Third Parties know private details about the visitor's medical history and drug use, among other information. The visitor is more likely to see advertisements related to their medical conditions and drug use as they browse the Internet.

10.     Defendants sold out their customers' trust for a simple reason: money. Because Defendants conceal this information from visitors to the HN website and the public, Plaintiff does not know the precise mechanism by which they profit from the sharing of visitors' browsing data, searches, IP addresses, unique cookie identifiers, and other information. On information and belief, Defendants profit by one or more of the following mechanisms. First, Defendants receive payments from Third Parties in exchange for those Third Parties' placement of Trackers and related cookies on the HN website. Second, Defendants receive a service or services from Third Parties either for free or at a discounted price. The service may be a technological tool embedded

in the website, such as tools to improve functionality or to monitor website usage and performance. Third, Defendants receive the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price. Plaintiff anticipates learning the precise mechanism(s) by which Defendants profit through discovery.

11. Health insurance patients do not anticipate that their trusted insurance provider will send their private health information to a hidden third party, especially when the insurance provider explicitly promises they will *not* install cookies if the visitor clicked "Decline." Here, the Third Parties with whom HN shares visitor information are especially poor stewards of that data. For example, The Trade Desk tracks visitors' identities and browsing data explicitly for the purpose of selling advertising space based on that visitor's interests and needs, as expressed through their browsing activity and search history. And Meta and Google have long and well-known histories of violating consumer privacy and trust for their own gain.

12. Defendants owed a variety of duties, including common law, statutory, contractual, and regulatory duties, to keep Plaintiff's and Class Members' communications safe, secure, and confidential.

13. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' communications, Defendants assumed legal and equitable duties to those individuals to protect and safeguard their information from unauthorized disclosure.

14. Defendants breached their duties under California state law, including, for example, the California Invasion of Privacy Act ("CIPA"). That statute provides California consumers with rights to control their personal information including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, and the right to request deletion of their personal information. Cal. Civ. Code § 630 *et seq*. Defendants breached their obligations under this statute by, for example, failing to provide visitors with appropriate notice that their information was being disclosed to Third Parties for third- and fourth-party use. The notice and consent Defendants purport to provide and obtain, through the cookie banner

provided on their website, is not appropriate, as a reasonable Consumer would not have understood those as notifying them of Defendants' disclosure of their communications to Third Parties for third- and fourth-party use.

15.    The Trackers installed by Defendants on their website are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of Defendants' visitors. Cal. Penal Code § 638.50(b). The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c). These devices were activated even *after* visitors clicked "Decline," meaning the disclosures occurred without any valid consent and in direct contradiction of Defendants' public assurances.

16.    Defendants repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from users. In fact, Defendants gave users a cookie banner that explicitly claimed they could "Decline" third-party cookies and tracking, then proceeded to install third-party cookies and Trackers anyway. This false opt-out not only fails to meet CIPA's requirements but amplifies the harm: it encouraged users to share sensitive data under the false belief that it would remain private.

17.    Defendants failed to provide Plaintiff and Class Members with a meaningful opportunity to opt out of the use of Trackers prior to disclosing their information. Second, even when users did opt out by clicking "Decline," Defendants continued to disclose their communications and identifying information to Third Parties. These dual failures underscore that Defendants' banner was a deceptive design element, not a genuine consent mechanism, and they render the disclosures unlawful under CIPA.

18.    Not only did Defendants fail to provide Plaintiff and Class Members with the opportunity to "opt-out," but they further failed to abide by their opt-out requests. Even after Plaintiff and Class Members chose the "Decline" option, Defendants continued to disclose their

communications to Third Parties like Meta, The Trade Desk, and Google.

19. Defendants' installation and use of the Trackers also violates the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*, because it constitutes unlawful, unfair, and fraudulent business practices. Defendants not only disclosed visitor communications to Third Parties without proper authorization, but they also presented visitors with a cookie banner that falsely suggested they could opt out of such disclosures. The banner was designed to give the appearance of compliance while functioning as a façade – visitors were tracked regardless of their choice. This bait-and-switch tactic is both unfair and deceptive, and it directly harmed Plaintiff and Class Members by luring them into using Defendants' website under false pretenses. This fraudulent conduct is especially egregious in context: Defendants are health insurance companies, entrusted with some of the most sensitive data a person can share. Health insurance customers and other visitors were led to believe that their visits to Defendants' website – often to explore coverage, find doctors, and learn about their health conditions – would remain private. Instead, those visits were monetized. This betrayal of patient trust magnifies both the harm and the unfairness of Defendants' conduct.

20. Defendants further made express and implied promises to protect Plaintiff's and Class Members' communications and maintain the privacy and confidentiality of communications that visitors exchanged with Defendants. These promises included affirmative statements in the Defendants' cookie banner. The banner's representation – that users could "Decline" tracking and "choose which types of cookies to allow" – constituted an express promise to honor visitor choice. But Defendants broke that promise. Even when Plaintiff and Class Members opted out, Defendants continued to track and transmit their data to Third Parties. In doing so, Defendants violated their express and implied contracts and deprived Plaintiff and Class Members of the privacy protections they were told they could expect.

21. Moreover, Defendants' cookie banner formed part of the overall agreement between Defendants and their visitors and website users. As the first and most visible interaction users had with the website, the banner constituted an explicit representation that users had control

over the disclosure of their data. By failing to honor opt-out selections and continuing to track users despite those selections, Defendants breached their contractual duties, violated the implied covenant of good faith and fair dealing, and deprived Plaintiff and Class Members of the benefit of their bargain.

22.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' communications, Defendants assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

23.     Defendants breached their common law, statutory, and contractual obligations to Plaintiff and Class Members by, *inter alia*, (i) failing to adequately review its web based technology to ensure the hospital website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiff and Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their communications to Third Parties for Third Party and fourth party[5] use, and ignoring Plaintiff and Class Members' preferences even when they explicitly declined consent; (v) failing to protect communications and take steps to block the transmission of Plaintiff's and Class Members' communications through the use of Tracking Technology; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor its website to maintain the confidentiality and integrity of visitor communications.

24.     As a result of Defendants' conduct, Plaintiff and Class Members have suffered numerous injuries-in-fact and damages, as detailed herein, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of private information; (iv) statutory damages; and (v) continued and ongoing risks to their private information.

25.     Plaintiff seeks to remedy these harms and brings causes of action for Negligence, Negligence Per Se, Violation of Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, Violation of Consumer Protection Law, Cal. Bus. & Prof. Code §§

---

[5] The term "fourth party" is defined and discussed below.

17200, *et seq.*, Violation of Consumer Privacy Act, Cal. Civ. Code, §§ 1798.100, *et seq.*, Breach of Express and Implied Contract, Unjust Enrichment, Breach of Fiduciary Duty, Declaratory Judgment, Breach of Confidence, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 631, *et seq.*, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 632, *et seq.*, Violation of Invasion of Privacy Act, Cal. Pen. Code §§ 638, *et seq.*, Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.*, and Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(3)(a), *et seq.*

## PARTIES

26.    Plaintiff Clark is a natural person and citizen of California, where he intends to remain. Plaintiff Clark resides in San Francisco, California. Plaintiff Clark is one of Defendants' insureds and a victim of Defendants' unauthorized Disclosure of his communications.

27.    Defendant Centene is a Delaware corporation with its headquarters at 7700 Forsyth Blvd., St. Louis, Missouri, 63105, and it may be served with process through its registered agent, CT Corporation System, 330 North Brand Blvd., Suite 700, Glendale, California, 91203.

28.    Defendant Health Net is a Delaware corporation with its headquarters at 7700 Forsyth Blvd., St. Louis, Missouri, 63105, and it may be served with process through its registered agent, CT Corporation System, 330 North Brand Blvd., Suite 700, Glendale, California, 91203.

29.    At all times relevant hereto, Defendant Centene owned and operated Defendant Health Net. On information and belief, the HN Website was controlled by Defendant Centene.

## JURISDICTION AND VENUE

30.    This Court has personal jurisdiction over Defendants because, personally or through their agents, Defendants operate, conduct, engage in, or carry on a business in this State, maintain corporate offices in California, and committed tortious acts in this State.

31.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Complete diversity exists between Defendants and at least one member of the proposed

Classes, and there are more than one hundred (100) members in the proposed Classes.

32.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because it arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367.

33.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district and continue to occur in this district.

## COMMON FACTUAL ALLEGATIONS

**A.    Defendants' Website Collects Sensitive, Private Information from Visitors.**

34.    Defendants offers health insurance plans. Defendants' offerings include plans marketed directly to consumers, in addition to business plans for both large and small employers.

35.    Defendants encourage prospective and existing customers to use the HN website, www.healthnet.com ("Website"). The Website provides various services, including the ability to explore health insurance coverage options,[6] find a provider for medical care and behavioral health,[7] visit a member portal,[8] view health support programs related to specific diagnoses,[9] and more.

36.    The Website includes pages on which visitors are encouraged to enter information about their identities, locations, medical histories, medications, conditions, and expected consumption of medical services. For example, HN provides a link entitled "Shop for Plans" on the Website's "Our Health Plans" page.[10] Visitors who click the link can fill out a form with their name, phone number, zip code, and email address.

---

[6] *Our Health Plans*, https://www.healthnet.com/content/healthnet/en_us/find-a-plan/medical.html (last visited Apr. 23, 2026).
[7] *Find a Provider*, https://findaprovider.healthnetcalifornia.com/location (last visited Apr. 23, 2026).
[8] *Log In*, https://www.healthnet.com/content/healthnet/en_us/login.html (last visited Apr. 23, 2026).
[9] *Health Support Programs*, https://www.healthnet.com/content/healthnet/en_us/population-health-management.html (last visited Apr. 23, 2026).
[10] *See Our Health Plans*, *supra* n. 6.

37.     For another example, a link entitled "Find a Provider" is also displayed prominently on the Website's landing page. [11] Visitors who click this link are prompted to share their exact location (via the "Use my current location" link) or their "Address, City, County or Zip Code."[12] After entering their location, visitors are prompted to specify what type of doctor they are searching for. *Id.* For example, the visitor may specify that they are searching for a doctor who specializes in "Medical Oncology." A user may also choose a category, such as "Behavioral Health," to narrow search results.

38.     Defendants' Website encourages visitors to enter sensitive and private information about their identities, locations, medical histories, medications, conditions, and expected consumption of medical services.

39.     Unbeknownst to visitors, when visitors enter the requested information on Defendants' Website, Defendants immediately share that sensitive and private information with third parties, including social media companies like Facebook, and the marketing/data brokerage companies Google and The Trade Desk. The sharing occurs because Defendants' Website includes Trackers and cookies that intercept visitors' communications with Defendants and share the contents of those communications with multiple third parties. What's worse, Defendants share this sensitive and private information *even if visitors explicitly direct Defendants not to do so* via Defendants' illusory opt-out cookie banner.

40.     Before describing Defendants' cookie banner and the specific Trackers and cookies that persist on their Website even after visitors attempt to opt out, it is useful to discuss how Trackers and cookies work in general.

**B.     How "Cookies" and "Trackers" Surreptitiously Share Users' Communications and Unique Identifiers With Third Parties.**

41.     Visiting a website involves a series of electronic communications between the visitor's browser and the website's servers. When a person visits a website like www.healthnet.com, their browser initiates a series of web requests to Defendants' servers,

---

[11] *See Find a Provider*, *supra* n. 7.
[12] *Id.*

requesting the webpage and associated resources. These are typically styled as HTTP "GET" requests. As the visitor's browser processes the webpage, additional requests may be triggered by scripts embedded within the webpage. These scripts are instructions sent by the webpage to the visitor's browser, which the visitor's browser then executes.

42. A visitor's interactions with a website may also involve HTTP "POST" requests. In a typical POST request, the visitor's browser sends information to the website's server.

43. "Trackers" are one type of script that may be embedded within a webpage delivered in response to a "GET" request. Trackers instruct a visitor's browser to send information about the visitor's browsing activity to the Tracker's developer. Tracked browsing information may include words typed, links clicked, time spent on each page, and buttons clicked by the visitor. This browsing information is typically accompanied by one or more data points that uniquely identify the visitor, such as their IP address, or a "cookie."

44. "Cookies" are small text files sent by a website server to a visitor's browser and stored locally on the visitor's device. Typically, cookies contain a unique identifier tied to a specific visitor. When a visitor's browser sends an HTTP request to a website server, the request includes the cookie or cookies that allow the server to identify the visitor.

45. First-party Trackers and cookies are those developed and set by the web server with which the visitor is knowingly communicating. Here, first-party Trackers and cookies are those developed by Defendants and set by Defendants' Website, www.healthnet.com.

46. Third-party Trackers and cookies are those developed and set by a third-party company or domain. Common third-party Trackers and cookies include those developed and set by Google, The Trade Desk, and Meta/Facebook, all of which are embedded in Defendants' Website. When a visitor's browser loads a webpage containing an embedded third-party Tracker, the Tracker – which is simply a script, *i.e.*, lines of code – instructs the visitor's browser to determine whether that third-party's cookie is already stored on the visitor's device. If not, the Tracker instructs the browser to store a new cookie uniquely associated with that visitor. If so, the Tracker instructs the browser to send the stored cookie to the third-party's server, typically along

with additional information about the visitor's browsing activity. Because third-party cookies persist across multiple sessions and webpages, third-party cookies allow their developers to track specific individual's browsing across websites and sessions.

47. Third-party Trackers and cookies like those present on Defendants' Website are generally invisible to the visitor, unless the visitor uses custom software designed to reveal Trackers and cookies.

48. When a visitor accesses a webpage containing third-party Trackers and cookies, the Trackers instantaneously intercept and duplicate communications sent between the visitor's browser and the website's server. Duplicated communications include the HTTP "GET" requests through which the visitor's browser requests the webpage and related resources, as well as the HTTP "POST requests, which typically deliver information the visitor entered on the site, such as a search query, email address, or radial or drop-down selections on a form.

49. Thus, while it appears to the visitor that their browser is communicating only with the owner of a specific website, in fact their communications are intercepted and shared in real-time with undisclosed third parties.

50. Here, while visitors to www.healthnet.com believe they are communicating only with Defendants, in fact their communications are intercepted and shared in real-time with various third parties – including Google, The Trade Desk, Microsoft, and Meta/Facebook – via the third-party Trackers Defendants embedded in Defendants' Website.

51. Third-party Trackers and cookies represent an invasion of privacy. When third-party Trackers and cookies are present on consumer-facing websites, information that consumers expect to remain private between themselves and the website's owner is surreptitiously intercepted and shared with undisclosed third parties.

52. Accordingly, many websites allow visitors to affirmatively opt-out of third-party Trackers and cookies. These opt-out tools are especially relevant where, as here, the website collects information that is particularly sensitive and private, such as the visitor's location, medical history, medications, conditions, and expected consumption of medical services. The

ability to opt-out of third-party tracking gives visitors comfort they may safely share private and sensitive information with a specific company – here, their health insurance provider – without fear that the information will be shared more widely. Were it not for the ability to opt-out of third-party tracking, many visitors would not be comfortable entering their medical information on the Internet.

53. Defendants purport to offer a tool by which Website visitors may opt-out of third-party Trackers and cookies, in the form of a "cookie banner" that appears when the visitor first loads the webpage and persists until the user clicks "Decline" or "Accept."

54. Unfortunately for Plaintiff and members of the putative Class, Defendants' purported opt-out mechanism is illusory. As described below, Defendants embed third-party Trackers and cookies even if the visitor clicks "Decline" on Defendants' cookie banner. Thus, Defendants share visitors' sensitive and private health information with third parties, even after explicitly promising not to do so.

**C.** **Defendants Falsely Promise that Website Visitors May Opt-Out of Third-Party Cookies and Tracking.**

55. When a visitor arrives on the Website, Defendants display a "cookie banner," which purports to allow the visitor to opt-out of third-party cookies and tracking.

56. The cookie banner is designed to give visitors comfort that the sensitive, private information they enter into Defendants' Website will not be shared with third parties.

57.    The banner appears as a pop-up overlay displayed on all pages of the Website. The banner persists on every page unless and until the user interacts with it. As shown below, the banner states that "This website uses cookies," and provides three options the visitor must choose between: "Decline" the use of cookies; "Accept" the use of cookies; or "Cookie Preferences."

This website uses cookies to ensure you get the best experience on our website.    Decline    Accept    ↑↓↑ Cookie Preferences

58. When a user clicked on "Cookie Preferences," a pop-up appears, shown below. The pop-up categorizes the cookies on Defendants' Website into four categories: "Essential," "Advertising," "Analytics & Customization," and "Performance and Functionality." "Essential" cookies are marked as "Always active." Accordingly, visitors may not opt-out of these cookies.

59. In contrast to "Essential" cookies, Defendants represent that visitors "may choose which types of cookies to allow" with respect to the other three categories. Thus, Defendants promises via the cookie banner that visitors may opt-out of all "Advertising," "Analytics & Customization," and "Performance & Functionality" cookies, either by clicking the "Decline" option on the cookie banner, or by de-selecting specific categories in the "Cookie Preferences" pop-up.

60. The second category is "Advertising" cookies, which Defendants say "help serve advertising content that is relevant to you." Defendants categorize cookies from the following entities as "Advertising" cookies: Meta, Google, Adobe, Microsoft, The Trade Desk, Bidswitch, Magnite, Index Exchange, Pubmatic, Demandbase, Delta, and LinkedIn.

61. The third category is "Analytics & Customization" cookies. Defendants categorize cookies from Salesforce here.

62. Defendants' cookie banner and associated "Cookie Preferences" pop-up create the illusion that Defendants are responsible stewards of their sensitive private information, and that visitors have control over whether the information they share with Defendants will in turn be shared with third parties. In fact, Defendants ignore visitors' preferences. The cookie banner is meaningless. Defendants install third-party Trackers and cookies regardless of whether visitors opt-out.

63. Even after visitors click "Decline" on the cookie banner, Defendants install at least the following third-party Trackers and cookies on the visitors' browsers as they navigate Defendants' Website. All cookies listed here are in categories Defendants define as non-"Essential" cookies that Defendants falsely represent will *not* be installed if visitors click

"Decline" or opt-out of specific categories in the "Cookie Preference" pop-up:

64. Google's "NID" and "IDE" cookies, both of which Google uses to build individualized profiles of visitors' interests for the purpose of selling targeted advertising.

65. The Trade Desk's "TDCPM" and "TDID" cookies, which The Trade Desk uses for the same purpose (targeted advertising).

66. Salesforce's "visitor_id*" and "visitor_id*-hash" cookies, which uniquely identify a visitor ID and its hash equivalent, and store the information"

67. Adobe's "demdex" and "everest_g_v2" cookies, which assign a unique ID to a site visitor and helps with "visitor identification, ID synchronization, segmentation, modeling, reporting, and so on."

68. Thus, the representations Defendants make in the cookie banner are false. Even after visitors "Decline" third-party Trackers and cookies, Defendants betray their trust and install third-party Trackers and cookies on their browsers anyway. The third-party Trackers and cookies they install include "Advertising" and other non-"Essential" cookies belonging to entities whose cookies Defendants explicitly promised would *not* be installed if the visitor opted out.

69. As a result, Defendants intercept visitors' communications with www.healthnet.com and disclose those communications to multiple third parties, even after visitors expressly direct Defendants not to do so. This betrayal of trust is particularly disturbing in light of the sensitive and private nature of the health-related information visitors generate on Defendants' Website, which Defendants immediately share with third party advertising companies like Google, Meta, and The Trade Desk, thereby violating visitors' privacy and betraying Defendants' explicit representations to visitors in their cookie banner.

**D.    The Information Defendants Intercepted and Disclosed is Deeply Sensitive and Private.**

70. The information Defendants' Trackers sent to Third Parties like TikTok, Meta, The Trade Desk, and Google includes private and confidential information that Plaintiff and Class Members submitted to Defendants' Website: *e.g.*, the pages they viewed and the buttons they clicked; keyword searches; status as insured individuals; and identifying information including

IP addresses and identifying cookies (the "Disclosed Information").

71. As an example, visitors can use Defendants' provider directory to search for medical professionals. When visitors conduct this type of search, Defendants share users' search details with Third Parties, revealing visitors' health concerns.

72. Similarly, when a user searches for keywords, such as "pregnancy," Defendants transmit events disclosing that the patient searched for the keyword, namely "searchTerm=pregnancy," with at least Google, The Trade Desk, and Salesforce.

73. And when a user visits specific pages on the Health Net domain – for example, the "Maternity & Family Planning" page – Defendants transmit events disclosing that the patient visited that page to at least The Trade Desk, Google, Meta, Adobe, and Salesforce.

74. Customers of Defendants can visit the Website to manage their insurance. Activities customers may perform include logging in, creating a new login, and paying their bill. As the customer performs any of these activities, Defendants transmit these events to Third Parties.

75. In all cases, including the examples discussed above, the Disclosed Information includes both a cookie unique to the individual's browser and an IP address. Both of these data points separately enable unique identification of a specific individual.

76. The Disclosed Information allows Third Parties to establish that a particular individual is seeking medical care, uses specific prescription drugs, suffers from a specific condition, lives in a specific geographic location, and is either insured or uninsured. Defendants' unauthorized disclosure engenders a variety of harmful consequences, including social stigma, higher insurance rates, familial stress, and loss of trust in healthcare providers leading to under-diagnosis and treatment.

77.    The Disclosed Information includes both Protected Health Information ("PHI")[13] and Personally Identifying Information ("PII")[14] linking the Disclosed Information to a specific visitor. The Disclosed Information includes browser-specific cookie IDs unique to each visitor ("Unique ID Cookies"), as well as the IP address unique to each visitor.

**E.    Defendants Profit from the Non-Consensual Disclosure of Visitors' Private Health Information, as do the Third Parties to Whom Defendants Disclose that Information.**

78.    On information and belief, the Third Parties with whom Defendants share visitors' private health information derive profit from the Disclosed Information through one or more of the following mechanisms: (1) building individualized profiles about visitors' interests and selling targeted advertising; (2) selling the Disclosed Information, possibly aggregated with additional information gleaned from other sources, to other third parties; and (3) providing analytics and other services in exchange for a subscription fee or other payment.

79.    Data harvesting is big business. As one court recently held, "[the Defendant] cannot seriously dispute that browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. As [the plaintiff's expert] explained, there is an entire 'data industry' and estimates suggests that that industry 'now generates combined annual revenues of

---

[13] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws- regulations/index.html (last accessed Apr. 16, 2020). Genesis Health is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[14] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person." 17 C.F.R. § 248.201(b)(8).

approximately $300 billion dollars.'" *John Doe et al v. Virginia Mason Medical Center*, No. 19-2-26674-1 SEA, 2024 WL 3517759 (Wash. Sup. Ct., June 6, 2024).

80.    Health data is particularly valuable. The collection and sale of consumer health data is both uniquely lucrative, and represents unique risks to consumer privacy.[15] As CNBC reported in 2019, "patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[16]

**F.    Defendants' Actions Violate Many Relevant Standards of Conduct**

*i.    Defendants Violated HIPPA Standards*

81.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace and denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

82.    Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect private information like that Plaintiff and Class Members communicated on Defendants' Website.

83.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a

---

[15] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.
[16] *See* Christina Farr, *Hospital Execs Say They are Getting Flooded with Requests for Your Health Data*, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

patient for marketing purposes without the patients' express written authorization.[17]

84.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

85.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[18]

86.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or him protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[19]

87.    In addition, in December 2022, the Office for Civil Rights (OCR) at the U.S.

---

[17] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[18] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, U.S. Department of Health and Human Services (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[19] *Marketing*, U.S. Department of Health and Human Services, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

Department of Health and Human Services (HHS) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[20] (the "December 2022 Bulletin").[21]

88. Therein, HHS defined Tracking Technologies, explaining:

Tracking technologies are used to collect and analyze information about how users interact with regulated entities' website or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.[22]

89. In the Bulletin, HHS was clear in unambiguous terms that, "[r]egulated entities are not permitted to use Tracking Technologies in a manner that would result in impermissible disclosures of PHI to Tracking Technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to Tracking Technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[23,24]

90. On March 18, 2024, HHS updated its December 2022 bulletin, "to increase clarity

---

[20] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Department of Health and Human Services, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.
[21] See archived version of the December 2022 Bulletin at HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 30, 2024).
[22] *Id*.
[23] *Id*. (bold emphasis in original)
[24] Citing *to* 45 CFR 164.508(a)(3); s*ee also* 45 CFR 164.501 (definition of "Marketing").

for regulated entities and the public" and reiterating the above basic privacy obligations.[25,26]

91.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

92.    An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to Tracking Technology vendors, because of the proliferation of Tracking Technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[27]

93.    In other words, HHS has expressly stated that Defendants' conduct of implementing Tracking Technologies is a violation of HIPAA Rules.

---

[25] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health and Human Svcs. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[26] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[27] *Id.* (emphasis in original) (internal citations omitted).

*ii.    Defendants Violated FTC and HHS Standards*

94.    The Federal Trade Commission ("FTC") has also recognized that implementation of Tracking Technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[28]

95.    The OCR and the FTC warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites such as Defendants', that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[29] OCR and FTC agree that such Tracking Technologies, like those present on Defendants' Website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[30] OCR and FTC warn that

> Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others.[31]

96.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[32]

---

[28] *Re: Use of Online Tracking Technologies*, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf).

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Federal Trade Commission (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

97.     Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use Tracking Technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[33] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a Tracking Technology for any marketing purposes."[34]

98.     Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id*. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[35]

99.     Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[36]

100.     As such, the FTC and HHS have expressly stated that conduct like Defendants' runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

101.     On March 18, 2024, HHS updated its December 2022 bulletin in the "March 2024

---

[33] *Id.*

[34] *Id.*

[35] *Statement of the Commission: On Breaches by Health Apps and Other Connected Devices,* U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

[36] *See, e.g., U.S. v. Easy Healthcare Corp.*, Case No. 1:23-cv-3107 (N.D. Ill. 2023); *In the Matter of BetterHelp, Inc.,* FTC Dkt. No. C-4796 (July 14, 2023); *U.S. v. GoodRx Holdings, Inc.,* Case No. 23-cv-460 (N.D. Cal. 2023); *In the Matter of Flo Health Inc.,* FTC Dkt. No. C-4747 (June 22, 2021).

Bulletin," expanding the circumstances in which HHS would consider information from any unauthenticated website visitor to be considered PHI, and its disclosure to be a violation of HIPAA.[37,38]

102.    The March 2024 Bulletin added guidance on when the disclosure of individually identifiable health information ("IIHI") is impermissible under HIPAA, explaining that: "the mere fact that an online Tracking Technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI *if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care*."[39]

103.    However, in contrast, when a user visits a website related to his or her past, present, or future health, health care, or payment for health care, such as "…looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care[,]" such that the disclosure of their information would be PHI, HIPAA rules apply, and that disclosure would be a violation of HIPAA.[40]

### iii.    Defendants Violated Industry Standards

104.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in

---

[37] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept. of Health and Human Svcs. Office for Civil Rights, (Dec. 1, 2022, updated Mar. 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[38] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[39] *Id.* (bold, italicized emphasis added).

[40] *Id.*

the physician-patient and hospital-patient relationship.

105. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to Defendants and their physicians.

106. AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

107. AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

108. AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

109. Plaintiff Clark has visited Defendants' Website to look at health insurance plans, find a provider, and log in to the member portal.

110. On information and belief, Plaintiff Clark was presented with the cookie banner on Defendants' Website, and consistent with his normal practice of routinely declining cookies when offered the choice, he clicked the "Decline" option.

111. Plaintiff Clark is a Facebook user but has not made any posts about his medical conditions or health insurance.

112. Plaintiff Clark reasonably expected that his online communications with

Defendants were confidential, solely between himself and Defendants, and that, as such, those communications would not be transmitted to or intercepted by a Third Party.

113. Plaintiff Clark provided information to Defendants and trusted that the information would be safeguarded according to industry standards, the representations in Defendants' cookie banner, and the law.

114. Plaintiff Clark never intended to sell his communications or Disclosed Information, nor would he have permitted it to be made available for sale on the resale market.

115. On information and belief, through their use of The Trade Desk Trackers, Google Trackers, and other Trackers, Defendants disclosed to Third Parties, like The Trade Desk and Google:

    a.   The pages and content Plaintiff Clark viewed;

    b.   Plaintiff Clark's seeking of insurance;

    c.   Plaintiff Clark's insured status;

    d.   Plaintiff Clark's search terms; and,

    e.   Plaintiff Clark's identifying information, including IP address and identifying cookies.

116. Plaintiff Clark accessed Defendants' Website at Defendants' direction and encouragement.

117. Plaintiff Clark and the Class Members visited Defendants' Website in relation to their past, present, and future insurance for health care. When Plaintiff Clark and Class Members used Defendants' Website, they thought they were communicating exclusively with their trusted insurance provider.

118. Plaintiff Clark relied on Defendants' Website to communicate and did so with the understanding that Defendants would not share his communications or Disclosed Information except as agreed in the Privacy Contracts.

119. At no point did Website visitors like Plaintiff Clark sign any written authorization permitting Defendants to send his communications or Disclosed Information to Third Parties (or

fourth parties) uninvolved in providing him with healthcare or health insurance.

120. Plaintiff Clark reasonably expected that his communications with Defendants were confidential, solely between each Plaintiff and Defendants, and that, as such, those communications and any information submitted would not be transmitted to or intercepted by third parties (or used by a fourth party).

121. Through the systematic data sharing process described herein, Plaintiff's interactions with Defendants' Website were disclosed to Third Parties, including The Trade Desk and Google. Plaintiff did not consent to those disclosures.

122. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's communications and Disclosed Information.

123. Plaintiff would not have submitted his information to Defendants if he had known it would be shared with Third Parties and fourth.

124. As a result of Defendants' Disclosure of Plaintiff's communications and Disclosed Information to Third Parties (and fourth parties) without authorization, Plaintiff was harmed in the following ways:

    a. Loss of privacy;

    b. Unauthorized disclosure of his communications and Disclosed Information;

    c. Unauthorized access to his communications and Disclosed Information by Third Parties;

    d. Defendants benefited from the use of Plaintiff's communications and Disclosed Information without sharing that benefit with Plaintiff;

    e. Lost benefit of his bargain with Defendants, as Plaintiff did not receive the reasonable privacy and data security protections for which he paid;

    f. Defendants enriched themselves at Plaintiff's expense without sharing the revenue, profit, and/or cost-savings attributable to collecting Plaintiff's communications and Disclosed Information without authorization and sharing it with Third Parties (and fourth parties);

g.  Defendants profited from collecting and disclosing Plaintiff's communications and Disclosed Information without authorization through one or more mechanisms, as-yet unknown to Plaintiff, which may include: (1) direct payments from Third Parties, including The Trade Desk and Google, (2) free or reduced cost for services, including services related to the implementation and monitoring of the Website, and/or (3) the ability to purchase ad space on other websites at a reduced price or at a greater value for the same price;

h.  Plaintiff lost his ability to keep his communications and Disclosed Information private;

i.  Embarrassment, humiliation, frustration, and emotional distress;

j.  Decreased value of Plaintiff's communications and Disclosed Information;

k.  Increased risk of future harm resulting from future use and disclosure of their communications and Disclosed Information; and

l.  Statutory damages.

## TOLLING, CONCEALMENT, AND ESTOPPEL

125.  The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

126.  Defendants seamlessly incorporated the Trackers into the Website while providing visitors using those platforms with no indication that their Website usage was being tracked and transmitted to Third Parties. Defendants knew that the Website incorporated the Trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive communications and Disclosed Information would be intercepted, collected, used by, and disclosed to Third Parties.

127.  Even while exercising due diligence, Plaintiff and Class Members could not have discovered the full scope of Defendants' conduct.

128.  All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendants' illegal interception and disclosure of Plaintiff's and the Class's communications and Disclosed Information has continued unabated.

What is more, Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations defenses.

**CLASS ACTION ALLEGATIONS**

129.    Plaintiff brings this nationwide class action on behalf of himself and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

130.    Plaintiff seeks to represent the following classes:

**Nationwide Class**: All individuals in the United States within the applicable statute of limitations who clicked "Decline" on Defendants' cookie banner and whose information was disclosed by Defendants to Third Parties through Defendants' Website's Tracking Technology without authorization.

**California Subclass**: All citizens of California within the applicable statute of limitations who clicked "Decline" on Defendants' cookie banner and whose information was disclosed by Defendants to Third Parties through Defendants' Website's Tracking Technology without authorization.

131.    Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, and any entity in which either Co-Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

132.    Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

133.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

134.    <u>Numerosity</u>: Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there likely millions of individuals throughout the United States whose communications were improperly used or disclosed by Defendants, and the Classes are identifiable within Defendants' records.

135.    <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendants' possession, custody, and control.

30
CLASS ACTION COMPLAINT

136.    Commonality and Predominance: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether Defendants disclosed Class Members' communications or Disclosed Information to Third Parties;

b.    Whether Class Members consented to Defendants' disclosure of their communications or Disclosed Information;

c.    Whether Defendants owed duties to Plaintiff and Class Members to protect their communications or Disclosed Information;

d.    Whether Defendants breached their duty to protect Plaintiff's and Class Members' communications or Disclosed Information;

e.    Whether Defendants' disclosure of Plaintiff's and Class Members' communications or Disclosed Information to Third Parties violated federal, state and local laws, or industry standards;

f.    Whether Defendants' failure to allow visitors a meaningful opportunity to opt out of sharing with Third Parties violated federal, state and local laws, or industry standards;

g.    Whether Defendants' conduct resulted in or was the actual cause of the disclosure of Plaintiff's and Class Members' communications or Disclosed Information;

h.    Whether Defendants' conduct resulted in or was the proximate cause of the disclosure of Plaintiff's and Class Members' communications or Disclosed Information;

i.    Whether Defendants have a contractual obligation to protect Plaintiff's and Class Members' communications or Disclosed Information and whether it complied with such contractual obligation;

j.    Whether Defendants have a duty of confidence and whether it complied with such obligation;

k. Whether Defendants' conduct amounted to violations of state consumer protection statutes;

l. Whether Defendants' conduct amounted to violations of state and federal wiretap statutes;

m. Whether Defendants' conduct amounted to violations of other California state laws;

n. Whether Defendants should retain Plaintiff's and Class Members' valuable communications or Disclosed Information;

o. Whether, as a result of Defendants' conduct, Plaintiff and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

137. Defendants have engaged in a common course of conduct toward Plaintiff and the Class Members, in that the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendants' conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

138. Typicality: Plaintiff's claims are typical of those of other Class Members because all had their communications or Disclosed Information compromised as a result of Defendants' use and incorporation of, The Trade Desk Trackers, Google Trackers and other Tracking Technology.

139. Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendants'

conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

140.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiff have suffered is typical of other Class Members. Plaintiff have also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

141.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

142.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged. If the class action device were not used, Defendants would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and

duplicative of this litigation.

143. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

144. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

145. Unless a Class-wide injunction is issued, Defendants may continue in its unlawful use and disclosure and failure to properly secure the communications or Disclosed Information of Plaintiff and the Class Members, Defendants may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendants may continue to act unlawfully as set forth in this Complaint.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Classes)**

146. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

147. Plaintiff and Class Members submitted sensitive nonpublic personal information, including communications and/or Disclosed Information, when accessing Defendants' Website.

148. Defendants owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' communications and Disclosed Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from disclosure and unauthorized transmittal and use of communications and/or Disclosed Information that occurred.

149. Defendants acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' communications or Disclosed Information by disclosing and providing access to this information to Third Parties for the financial benefit of Third Parties (and fourth parties) and Defendants.

150.    Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' disclosure of their communications or Disclosed Information to benefit Third Parties (and fourth parties) and Defendants. Defendants actively sought and obtained Plaintiff's and Class Members' communications or Disclosed Information. And Defendants knew or should have known that by integrating Tracking Technology on the Website that Plaintiff's and Class Members' nonpublic personal information, including communications or Disclosed Information, would be disclosed to the Third Parties (and used by the fourth parties).

151.    Plaintiff's and Class Members' communications and Disclosed Information are highly valuable, and Defendants knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their communications or Disclosed Information to Third Parties. This disclosure was of benefit to the Third Parties (and fourth parties) and Defendants by way of data harvesting, advertising, and increased sales.

152.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers in the handling and securing of communications and/or Disclosed Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

153.    As a direct, proximate, and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their communications or Disclosed Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

154.    Defendants' negligence and breach of their common-law duties to exercise reasonable care directly and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their communications or Disclosed Information by Third Parties (and fourth parties); improper

disclosure of their communications or Disclosed Information; receipt of targeted advertisements reflecting private health information; lost benefit of their bargain; lost value of their communications or Disclosed Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendants' negligence; value to Plaintiff and the Class Members of surrendering their choices to keep their communications or Disclosed Information private and allowing Defendants to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiff's and the Class Members' communications or Disclosed Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

155. Defendants' negligence directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' communications or Disclosed Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendants' conduct. Plaintiff and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendants' negligence.

156. Plaintiff and Class Members seek to recover the value of the unauthorized access to their communications or Disclosed Information resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use value of the intellectual property—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such intellectual property to the

infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their communications and Disclosed Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

157.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

### COUNT II
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Classes)

158.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

159.    Plaintiff being this negligence *per se* count in the alternative to their common law negligence claim.

160.    Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information"), and the other sections identified above, Defendants were required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' communications and Disclosed Information.

161.    Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

162.    Defendants had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' communications or Disclosed

Information.

163. Defendants owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their communications or Disclosed Information being improperly disclosed to unauthorized Third Parties.

164. It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' communications or Disclosed Information in compliance with applicable laws would result in unauthorized Third Parties gaining access to Plaintiff's and Class Members' communications or Disclosed Information, and resulting in Defendants' liability under principles of negligence *per se*.

165. Defendants violated their duty under Section 5 of the FTC Act, and/or state law by failing to use reasonable measures to protect Plaintiff's and Class Members' communications or Disclosed Information and not complying with applicable industry standards as described in detail herein.

166. Plaintiff's and Class Member's communications or Disclosed Information constitutes personal property that was taken and misused as a proximate result of Defendants' negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

167. As a proximate result of Defendants' negligence *per se* and breach of duties as set forth above, Plaintiff and Class Members were caused to, *inter alia*, have their data shared with Third Parties without their authorization or consent, receive unwanted advertisements that reveal specific information related to seeking healthcare, fear, anxiety and worry about the status of their communications or Disclosed Information, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their communications or Disclosed Information, all of which can constitute actionable actual damages.

168. Defendants' conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' communications or Disclosed Information, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendants' conduct. Plaintiff and Class Members seek

actual, and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendants' negligence *per se*.

169.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

<u>**COUNT III**</u>
**VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, CAL. PENAL CODE § 502**
**(On Behalf of Plaintiff and the California Subclass)**

170.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

171.    The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems," and finding and declaring "that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data." Cal. Penal Code § 502(a).

172.    In enacting the CDAFA, the Legislature further found and declared "that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

173.    Plaintiff's and the Class Members' devices on which they accessed Defendants' Website, including their computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. Cal. Penal Code § 502(b)(5).

174. By conduct complained of in the preceding paragraphs, Defendants violated Section 502(c)(1)(B) of CDAFA by knowingly accessing without permission Plaintiff's and Class Members' devices in order to wrongfully obtain and use their personal data, including their communications or Disclosed Information, in violation of Plaintiff's and Class Members' reasonable expectations of privacy in their devices and data.

175. Defendants violated Cal. Penal Code § 502(c)(2) by knowingly and without permission accessing, taking, copying, and using Plaintiff's and the Class Members' communications or Disclosed Information.

176. Defendants used Plaintiff's and Class Members' data as part of a scheme to defraud them and wrongfully obtain their data and other economic benefits. Specifically, Defendants intentionally concealed from Plaintiff and Class Members that Defendants had secretly installed tracking pixels on the Website that surreptitiously shared communications and/or Disclosed Information with Third Party advertising companies like The Trade Desk and Google. Had Plaintiff and Class Members been aware of this practice, they would not have used Defendants' Website.

177. The computers and mobile devices that Plaintiff and Class Members used when accessing Defendants' Website all have and operate "computer services" within the meaning of CDAFA. Defendants violated § 502(c) of the CDAFA by knowingly and without permission accessing and using those devices and computer services, and/or causing them to be accessed and used, *inter alia*, in connection with the Third Parties' (and fourth parties') wrongful use of such data.

178. Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."

179. Defendants violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via Trackers embedded into the Website which intercepted Plaintiff's and

the Class Members' private and sensitive medical information.

180.   Defendants' violation of the CDAFA caused Plaintiff and Class Members, at minimum, the following injuries:

    a.   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b.   Defendants eroded the essential confidential nature of their relationship;

    c.   Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

    d.   Plaintiff and Class Members did not get the full value of the services for which he paid, which included Defendants' duty to maintain confidentiality; and

    e.   Defendants' actions diminished the value of Plaintiff's and Class Members' communications or Disclosed Information.

181.   Plaintiff and the Class Members seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief; as well as punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) as Defendants' violations were willful and, upon information and belief, Defendants are guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294; and reasonable attorney's fees under § 502(e)(2).

182.   Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT IV**
**VIOLATION OF CALIFORNIA'S CONSUMER PROTECTION LAW ("UCL"),**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
**(On Behalf of Plaintiff and the California subclass)**

183.   Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

184. Plaintiff and Defendants are each a "person" under Cal. Bus. & Prof. Code § 17201.

185. The California Business and Professions Code §§ 17201, *et seq.* prohibits acts of unfair competition, which includes unlawful business practices.

186. Defendants' business acts and practices are "unlawful" under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et. seq.* (the "UCL") because, as alleged above, Defendants violated California common law and other statutes, as alleged herein.

187. Defendants engaged in unlawful acts and practices by embedding the Pixel on the Website, which tracks, records, and transmits Plaintiff's and Class Members' communications or Disclosed Information they shared with Defendants in confidence on their Website to Third Parties without Plaintiff's and Class Members' knowledge and/or consent, in violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; and by representing that their services have characteristics, uses, or benefits that they do not have in violation of Civil Code § 1770.

188. When using Defendants' Website and services, Plaintiff and Class Members relied on Defendants' status as trusted health insurance institutions.

189. Inconsistent with their role as health insurance providers, Defendants disclosed Plaintiff's and Class Members' communications or Disclosed Information to Third Parties without their consent and for marketing purposes. Thus, Defendants represented that their services have characteristics, uses, or benefits that they do not have and represented that their services are of a particular standard, quality, or grade when they were not, in violation of Cal. Civil Code § 1770.

190. Plaintiff and Class Members were reasonable to assume, and did assume, that Defendants would take appropriate measures to keep their communications or Disclosed Information secure and not share it with Third Parties or allow Third Parties (and fourth parties) to use it without their express consent.

191. Had Plaintiff and Class Members known that Defendants would intercept, collect, and transmit their communications or Disclosed Information to Third Parties, Plaintiff and the

Class Members would not have used Defendants' services.

192.    Plaintiff and Class Members have a property interest in their communications or Disclosed Information. By surreptitiously collecting and otherwise misusing Plaintiff's and Class Members' communications or Disclosed Information, Defendants have taken property from Plaintiff and Class Members without providing just (or indeed any) compensation.

193.    By deceptively collecting, using, and sharing Plaintiff's and Class Members' communications or Disclosed Information with Third Parties for Third-Party (and fourth-party) use, Defendants have taken money or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Class.

194.    Defendants' business acts and practices also meet the unfairness prong of the UCL according to all three theories of unfairness.

195.    First, Defendants' business acts and practices are "unfair" under the UCL pursuant to the three-part test articulated in *Camacho v. Automobile Club of Southern California* 142 Cal. App. 4th 1394, 1403: (a) Plaintiff and Class Members suffered substantial injury due to Defendants' Disclosure of their communications or Disclosed Information; (b) Defendants' disclosure of Plaintiff's and Class Members' communications or Disclosed Information provides no benefit to visitors, let alone any countervailing benefit that could justify Defendants' Disclosure of communications or Disclosed Information without consent for marketing purposes or other pecuniary gain; and (c) Plaintiff and Class Members could not have readily avoided this injury because they had no way of knowing that Defendants were implementing Tracking Technology.

196.    Second, Defendant's business acts and practices are "unfair" under the UCL because they are "immoral, unethical, oppressive, unscrupulous, or substantially injurious" to Plaintiff and Class Members, and "the utility of [Defendant's] conduct," if any, does not "outweigh the gravity of the harm" to Plaintiff and Class Members. *Drum v. San Fernando Valley Bar Ass'n,* (2010) 182 Cal. App. 4th 247, 257. Defendants secretly collected, disclosed, and otherwise misused Plaintiff's and Class Members' communications or Disclosed Information by

bartering it to Third Parties in return for marketing and profit. This surreptitious, willful, and undisclosed conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious. Moreover, no benefit inheres in this conduct, the gravity of which is significant.

197. Third, Defendants' business acts and practices are "unfair" under the UCL because they run afoul of "specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal. App. 4th at 256 (internal quotation marks and citations omitted). California has a strong public policy of protecting consumers' privacy interests, including consumers' personal data, as codified in California's Constitution in Article I, section 1; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; and the CDAFA, Cal. Penal Code § 502, among other statutes.

198. Defendants violated this public policy by, among other things, surreptitiously collecting, disclosing, and otherwise exploiting Plaintiff's and Class Members' communications or Disclosed Information by sharing that information with Third Parties via Tracking Technologies without Plaintiff's and/or Class Members' consent.

199. Had Plaintiff and Class Members known Defendants would intercept, collect, and transmit their communications or Disclosed Information to The Trade Desk and Google, and other Third Parties, Plaintiff and Class Members would not have used Defendants' services.

200. Plaintiff and Class Members were reasonable to assume, and did assume, that Defendants would take appropriate measures to keep their communications or Disclosed Information secure and not share it with Third Parties without their express consent. Defendants were in sole possession of and had a duty to disclose the material information that Plaintiff's and Class Members' communications or Disclosed Information would be shared with Third Parties via Trackers. Defendants did not disclose at any time that they were sharing communications or Disclosed Information with Third Parties via Trackers.

201. Plaintiff and Class Members have lost money and property due to Defendants' conduct in violation of the UCL. Disclosed Information such as that which Defendants collected and transmitted to Third Parties has objective monetary value. Companies are willing to pay for such Disclosed Information, like the information Defendants unlawfully collected and transmitted

to Third Parties. For example, Pfizer annually pays approximately $12 million to purchase similarly sensitive information on health data, from various sources.[41]

202.    By deceptively collecting, using, and sharing Plaintiff's and Class Members' communications or Disclosed Information with Third Parties, and by allowing Third Parties (and fourth parties) to use their communications or Disclosed Information, Defendants have taken money and/or property from Plaintiff and Class Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Class.

203.    As a direct and proximate result of Defendants' unfair and unlawful methods and practices of competition, Plaintiff and Class Members suffered actual damages, including, but not limited to, the loss of the value of their Disclosed Information.

204.    As a direct and proximate result of its unfair and unlawful business practices, Defendants have each been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, declaratory relief, attorney fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

**<u>COUNT V</u>**
**VIOLATION OF CALIFORNIA CONSUMER PRIVACY ACT,**
**Cal. Civ. Code § 1798.100, *et seq.***
**(On Behalf of Plaintiff and the California subclass)**

205.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

206.    The CCPA grants consumers rights, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they

---

[41]    Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, SciAm (Feb. 1, 2016), https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (last visited Jul. 16, 2025).

45
CLASS ACTION COMPLAINT

exercise privacy rights. Cal. Civ. Code § 1798.100, *et seq*.

207.    The CCPA dictates specifically that "[a] third party shall not sell <u>or share</u> personal information about a consumer that has been sold to<u>, or shared with,</u> the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civ. Code § 1798.115 (emphasis added).

208.    The CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. The CCPA further explicitly states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* Thus, the 'opt-out requirements' under the CCPA apply in this online context.

209.    Defendants collected Plaintiff's and Class Members communications and/or Disclosed Information, including their personal information, with the purpose of providing health insurance services in the course of and as part of their business in California.

210.    Plaintiff alleges that Defendants allowed Third Parties to embed Trackers, such as The Trade Desk and Google, on the Website and that these Trackers transmitted Plaintiff's personal information.

211.    Disclosing Plaintiff's and Class Members' communications or Disclosed Information to Third Parties was not reasonably necessary or proportionate to perform the reasonably expected health insurance services that they applied for or received.

212.    By collecting, using, and selling Plaintiff's and Class Members' personal information and location data to Third Parties for Third Party (and fourth party) use, all without providing consumers with notice, Defendants violated the CCPA.

213.    By failing to inform visitors like Plaintiff and Class Members of the personal information collected about them and the Third Parties with whom that personal information was shared, and the Third Parties' (and fourth parties') use of that personal information, Defendants violated the CCPA.

214. By failing to abide by visitors' requests to delete collected personal information, Defendants violated the CCPA.

215. Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiff will send Defendants notice of their CCPA claims shortly after the date of this filing. If Defendants do not correct their business practices, Plaintiff will amend (or seek leave to amend) the complaint to add claims for monetary relief, including statutory and actual damages under the CCPA. To date, Defendants have failed to cure the CCPA violation.

216. As a result of Defendants' reckless violations, Plaintiff and Class Members are entitled to actual damages, statutory damages, and attorneys' fees and costs. Cal. Civ. Code § 1798.150.

## COUNT VI
## BREACH OF EXPRESS AND IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Classes)

217. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

218. Plaintiff and Class Members also entered into an express and implied contract with Defendants when they obtained health insurance from Defendants, or otherwise provided nonpublic personal information, including communications or Disclosed Information, to Defendants.

219. As part of these transactions, Defendants explicitly and implicitly agreed to safeguard and protect Plaintiff's and Class Members' communications or Disclosed Information.

220. Plaintiff and Class Members entered into express and implied contracts with the reasonable expectation (based on Defendants' own express and implied promises) that Defendants would keep their nonpublic personal information, including Disclosed Information, confidential. Plaintiff and Class Members believed that Defendants would use part of the monies paid to Defendants under the express and implied contracts to keep their nonpublic personal information, including Disclosed Information, confidential.

221. Plaintiff and Class Members would not have provided and entrusted their

nonpublic personal information, including communications and/or Disclosed Information, or would have paid less for Defendants' services, in the absence of the express and implied contract or implied terms between them and Defendants. The safeguarding of the nonpublic personal information, including communications and Disclosed Information, of Plaintiff and Class Members was critical to realize the intent of the parties.

222.    As extensively detailed above, Defendants breached express and implied contracts with Plaintiff and Class Members to protect their nonpublic personal information, including communications and Disclosed Information, when it disclosed that information to Third Parties.

223.    As a direct and proximate result of Defendants' breach of express and implied contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above.

## COUNT VII
### UNJUST ENRICHMENT (AS ALTERNATIVE TO CONTRACT CLAIMS)
### (On Behalf of Plaintiff and the Classes)

224.    Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

225.    Plaintiff and Class Members have an interest, both equitable and legal and financial, in their communications and/or Disclosed Information, that was conferred upon, collected by, and maintained by Defendants and that was ultimately disclosed without their consent.

226.    Plaintiff and Class Members conferred a monetary benefit upon Defendants in the form of valuable, sensitive, personal, and healthcare information—communications and/or Disclosed Information—in addition to monies paid, that Defendants collected from Plaintiff and Class Members under the guise of keeping this information private. Defendants collected, used, and disclosed this information for their own gain, for marketing purposes, and for sale or trade with Third Parties. Defendants did not share this benefit with Plaintiff and Class Members.

227.    Plaintiff and Class Members would not have used Defendants' services, or would have paid less for those services, if they had known that Defendants would collect, use, and

disclose their communications or Disclosed Information to Third Parties or allow Third Parties (and fourth parties) to use their communications or Disclosed Information.

228. Defendants appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

229. The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendants to retain the profit and/or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

230. Defendants continue to benefit and profit from their retention and use of Plaintiff's and Class Members' communications or Disclosed Information, while its value to Plaintiff and Class Members has been diminished.

231. Plaintiff pleads this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages or enters judgment on them in favor of the Defendants, Plaintiff will have no adequate legal remedy. Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in his other causes of action, in the event that such causes of action do not succeed. Plaintiff and the Class Members may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

232. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein

**COUNT VIII**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

233. Plaintiff realleges and incorporates the above allegations as if fully set forth herein.

234. A relationship existed between Plaintiff and Class Members, on the one hand, and Defendants, on the other, in which Plaintiff and Class Members put their trust in Defendants to

protect the communications or Disclosed Information of Plaintiff and Class Members, and Defendants accepted that trust.

235. Defendants breached the fiduciary duty they owed to Plaintiff and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, their communications or Disclosed Information.

236. Defendants' breach of fiduciary duty was a legal cause of injury-in-fact and damage to Plaintiff and Class Members, as alleged herein.

237. But for Defendants' breach of fiduciary duty, the injury-in-fact and damage to Plaintiff and Class Members would not have occurred.

238. Defendants' breach of fiduciary duty substantially contributed to Plaintiff's and Class Members' damages.

239. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, compensatory, nominal and punitive damages, injunctive relief, and all other relief allowed by law.

## COUNT IX
## DECLARATORY JUDGMENT
**(On Behalf of Plaintiff the Nationwide Class, and the California Subclass)**

240. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

241. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

242. An actual controversy has arisen regarding Defendants' present and prospective common law and other duties to keep visitors' communications and Disclosed Information confidential and whether Defendants are currently keeping that information confidential. Plaintiff and similar Class Members thus remain at imminent risk that additional disclosure of their

communications or Disclosed Information will occur in the future.

243. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendants continue to owe a legal duty to secure visitors' communications or Disclosed Information, under the common law, HIPAA, Section 5 of the FTC Act, and various state statutes;

    b. Defendants continue to breach this legal duty by disclosing visitors' communications or Disclosed Information to unaffiliated Third Parties.

244. The Court also should issue corresponding prospective injunctive relief requiring Defendants to keep their nonpublic personal information, including communications and Disclosed Information, confidential consistent with law and industry standards.

245. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial as the Trackers remain operative on Defendants' Website to this day. If additional disclosure occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

246. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if Defendants continue to disclose visitors' communications or Disclosed Information, Plaintiff and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendants of complying with an injunction by keeping visitors' communications or Disclosed Information confidential is relatively minimal (for example, removing Trackers from the Website), and Defendants have a pre-existing legal obligation to do so.

247. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing Defendants' additional unlawful disclosures of visitors' communications or Disclosed Information, thus eliminating the

additional injuries that would result to Plaintiff and the hundreds of thousands of visitors whose information has been and will continue to be disclosed.

**COUNT X**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

248.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

249.    At all times during Plaintiff's and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' communications and/or Disclosed Information.

250.    As alleged herein and above, Defendants' relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' communications or Disclosed Information, would be collected, stored, and protected in confidence, and would not be disclosed to Third Parties, or used by Third Parties (and fourth parties) without notice and consent.

251.    Plaintiff and Class Members provided Defendants with their communications or Disclosed Information, with the explicit and implicit understandings that Defendants would protect and not permit that information to be disseminated to and used by unaffiliated Third Parties (and fourth parties) without notice, consent, and sufficient opportunity to opt out.

252.    Defendants voluntarily received in confidence Plaintiff's and Class Members' communications or Disclosed Information, with the understanding and affirmative representation to visitors that the information would not be disclosed or disseminated to unaffiliated Third Parties for Third Parties' (and fourth parties') marketing purposes.

253.    Defendants disclosed Plaintiff's and Class Members' communications or Disclosed Information, without notice, without express permission, and without opportunity to opt out.

254.    But for Defendants' Disclosure of Plaintiff's and Class Members' Disclosed Information, in violation of the parties' understanding of confidence, their communications or

Disclosed Information would not have been disclosed to Third Parties, or used for Third-Party (and fourth-party) marketing and profit, without their consent.

255. The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendants' nonconsensual disclosure of Plaintiff's and Class Members' communications or Disclosed Information. Defendants knew they were disclosing Plaintiff's and Class Members' communications or Disclosed Information to Third Parties, for Third-Party (and fourth-party) use, without their consent.

256. As a direct and proximate result of Defendants' breaches of confidence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

257. Plaintiff seeks all monetary and non-monetary relief allowed by law.

**COUNT XI**
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**
**CAL. PENAL CODE §§ 631**
**(On Behalf of Plaintiff and the California subclass)**

258. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

259. The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq*. declaring that:

> advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

> The Legislature by this chapter intends to protect the right of privacy of the people of this state.

Cal. Penal Code § 630.

260. To establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

261.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

262.    Defendants' Website and the Tracking Technologies Defendants intentionally installed on it are prohibited, as they constitute a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

263.    All alleged communications between individual Plaintiff or Class Members and Defendants qualify as protected communications under CIPA because each communication is

made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

264. CCPA and CIPA are complementary statutes. CCPA states that "law relating to consumers' personal information should be construed to harmonize with the provisions of this title." Cal. Civ. Code § 1798.175. CCPA further explicitly states that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* The 'opt-out requirements' under the CCPA apply in this online context.

265. As alleged in the preceding paragraphs, by use of Tracking Technology, Defendants used a recording device to record the confidential communications in transit including communications or Disclosed Information without the consent of Plaintiff or Class Members and then transmitted such information to Third Parties for Third-Party (and fourth-party) use.

266. At all relevant times, Defendants' aiding of Third Parties to learn the contents of communications and Defendants' recording of confidential communications were without Plaintiff's and the Class Members' authorization and consent.

267. Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendants. Defendants had duties under statutory and common law to safeguard visitors' communications and/or Disclosed Information, and not disclose it without authorization. Defendants never received any authorization and disclosed Plaintiff's and Class Members' communications or Disclosed Information regardless.

268. Defendants engaged in and continued to engage in interception by aiding others (including The Trade Desk and Google) to secretly record the contents of Plaintiff's and Class Members' wire communications.

269. The intercepting devices used in this case include, but are not limited to:

a. Those to which Plaintiff's and Class Members' communications were disclosed;

b. Plaintiff's and Class Members' personal computing devices;

c.  Plaintiff's and Class Members' web browsers;

d.  Plaintiff's and Class Members' browser-managed files;

e.  Trackers like The Trade Desk Tracker;

f.  Trackers like the Google Tracker;

g.  Trackers like the Microsoft Tracker;

h.  Internet cookies;

i.  Other pixels, Trackers, and/or Tracking Technology installed on Defendants' Website and/or server(s);

j.  Defendants' computer servers;

k.  Third Party source code utilized by Defendants; and

l.  Third Party computer servers (including The Trade Desk and Google).

270.    Defendants aided in the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendants that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, its existence, and its contents.

271.    Plaintiff and Class Members reasonably expected that their communications and Disclosed Information were not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

272.    No legitimate purpose was served by Defendants' willful and intentional disclosure of Plaintiff's and Class Members' communications or Disclosed Information to Third Parties. Neither Plaintiff nor Class Members consented to the disclosure of their communications or Disclosed Information by Defendants to Third Parties or the use of the communications or Disclosed Information by Third Parties (and fourth parties).

273.    The Trackers that Defendants used are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiff's and Class Members' communications were intercepted in transit to the intended recipient (Defendants) before they reached Defendants' servers.

274. Defendants willingly facilitated the Third Parties' interception and collection of Plaintiff's and Class Members' communications or Disclosed Information, and the Third Parties' (and fourth parties') use of their communications or Disclosed Information, by embedding the Trackers on the Website. Moreover, Defendants had full control over these Trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

275. Defendants gave substantial assistance to Third Parties in violating the privacy rights of visitors to Defendants' Website, even though Defendants' conduct constituted a breach of the confidentiality duties that they owed, including the duty health insurance institutions owe to their insured and insureds' property. Defendants knew that the installation of the Trackers on the Website would result in the unauthorized disclosure of visitors' communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

276. Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their communications or Disclosed Information, including using their communications or Disclosed Information to develop marketing and advertising strategies.

277. The communications or Disclosed Information that Defendants assisted Third Parties with reading, learning, and exploiting, included Plaintiff's and Class Members' communications or Disclosed Information visitors input into and accessed on Defendants' Website. Defendants disclosed details about visitors, like Plaintiff's and Class Members' communications or Disclosed Information and their interactions with Defendants' Website, their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies.

278. Plaintiff and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as

injunctive or other equitable relief.

279.    In addition to statutory damages, Defendants' violations caused Plaintiff and Class Members the following injuries:

    a.  Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private.

    b.  Defendants eroded the essential confidential nature of their relationship.

    c.  Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

    d.  Plaintiff and Class Members did not get the full value of the health insurance services for which they paid, which included Defendants' duty to maintain confidentiality; and

    e.  Defendants' actions diminished the value of Plaintiff's and Class Members' communications or Disclosed Information.

280.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT XII
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 632
### (On Behalf of Plaintiff and the California subclass)

281.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

282.    CIPA § 632(a) prohibits an entity from intentionally and without the consent of all parties to a confidential communication, using an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

283.    As alleged in the preceding paragraphs, by use of Tracking Technology,

Defendants used a recording device to record the confidential communications including Disclosed Information without the consent of Plaintiff or Class Members, and then transmitted such information to Third Parties for Third-Party (and fourth-party) use.

284.    At all relevant times, Defendants' aiding of Third Parties to learn the contents of communications and Defendants' recording of confidential communications were without Plaintiff's and the Class Members' authorization and consent.

285.    Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendants. Defendants had duties under statutory and common law to safeguard visitors' communications and Disclosed Information, and not disclose it without authorization. Defendants never received any authorization and disclosed Plaintiff's and Class Members' communications and Disclosed Information regardless.

286.    Defendants engaged in and continued to engage in interception by aiding others (including The Trade Desk and Google) to secretly record Plaintiff's and Class Members' wire communications.

287.    The intercepting devices used in this case include, but are not limited to:

    a.    Those to which Plaintiff's and Class Members' communications were disclosed;

    b.    Plaintiff's and Class Members' personal computing devices;

    c.    Plaintiff's and Class Members' web browsers;

    d.    Plaintiff's and Class Members' browser-managed files;

    e.    Trackers like The Trade Desk Tracker;

    f.    Trackers like the Google Tracker;

    g.    Trackers like the Microsoft Tracker;

    h.    Internet cookies;

    i.    Other pixels, Trackers, and/or Tracking Technology installed on Defendants' Website and/or server(s);

    j.    Defendants' computer servers;

    k.    Third Party source code utilized by Defendants; and

l.    Third Party computer servers (including The Trade Desk and Google).

288.    Defendants aided in the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendants that were redirected to and recorded by the Third Parties include information which identifies the parties to each communication, its existence, and its contents.

289.    Plaintiff and Class Members reasonably expected that their communications or Disclosed Information were not being intercepted, recorded, and disclosed to Third Parties or used by Third Parties (and fourth parties) for marketing and profit.

290.    No legitimate purpose was served by Defendants' willful and intentional disclosure of Plaintiff's and Class Members' communications or Disclosed Information to Third Parties. Neither Plaintiff nor Class Members consented to the disclosure of their communications or Disclosed Information by Defendants to Third Parties or the use of the communications or Disclosed Information by Third Parties (and fourth parties).

291.    The Trackers that Defendants used are designed such that they transmitted each of a website user's actions to Third Parties alongside and contemporaneously with the user initiating the communication. Thus, Plaintiff's and Class Members' communications were intercepted in transit to the intended recipient (Defendants) before they reached Defendants' servers.

292.    Defendants willingly facilitated the Third Parties' interception and collection of Plaintiff's and Class Members' communications or Disclosed Information, and the Third Parties' (and fourth parties') use of their communications or Disclosed Information, by embedding Trackers on the Website. Moreover, Defendants had full control over these Trackers, including which webpages contained the pixels, what information was tracked and shared, and how events were categorized prior to transmission.

293.    Defendants gave substantial assistance to Third Parties in violating the privacy rights of visitors to Defendants' Website, even though Defendants' conduct constituted a breach of the confidentiality duties that it owed, including the duty healthcare institutions owe to their Website visitors and those visitors' property. Defendants knew that the installation of the Trackers

on the Website would result in the unauthorized disclosure of visitors communications to Third Parties, and Third Party (and fourth party) use of those communications, yet nevertheless did so anyway.

294.   Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their communications or Disclosed Information, including using their communications or Disclosed Information to develop marketing and advertising strategies.

295.   The communications or Disclosed Information that Defendants assisted Third Parties with reading, learning, and exploiting, included Plaintiff's and Class Members' communications and Disclosed Information visitors input into and accessed on Defendants' Website. Defendants disclosed details about visitors, like Plaintiff's and Class Members' communications and Disclosed Information and their interactions with Defendants' Website, their status as medical patients; their searches for health conditions or concerns; and identifying information including IP addresses and identifying cookies.

296.   Plaintiff and the Class Members seek statutory damages under Cal. Penal Code § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

297.   In addition to statutory damages, Defendants' violations caused Plaintiff and Class Members the following damages.

    a.   Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private.

    b.   Defendants eroded the essential confidential nature of their relationship.

    c.   Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

    d.   Plaintiff and Class Members did not get the full value of the health insurance

services for which they paid, which included Defendants' duty to maintain confidentiality; and

e. Defendants' actions diminished the value of Plaintiff's and Class Members' communications or Disclosed Information.

298. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT XIII
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 638.51, *et seq.*
### (On Behalf of Plaintiff and the California subclass)

299. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

300. CIPA § 638.51 prohibits the installation or use of "a pen register or trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a).

301. Defendants repeatedly violated CIPA § 638.51(a) by installing and using the Trackers without a court order and without any valid consent from users. Defendants' continued use of Trackers after a user clicked "Decline all," as described in detail above, demonstrates that no valid consent was obtained. Instead, Defendants relied on a knowingly deceptive interface that falsely conveyed user control while continuing to intercept and transmit private communications.

302. An "electronic communication" is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system[.]" Cal. Penal Code § 629.51(a)(2).

303. All communications between individual Plaintiff or Class Members and Defendants qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

304. California Penal Code § 638.50(b) defines a "pen register" as "a device or process

that records or decodes dialing, routing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

305. The Trackers are "pen registers" under § 638.50(b) of CIPA because they record "routing, addressing, or signaling information" transmitted by the devices of visitors to Defendants' Website. Cal. Penal Code § 638.50(b).

306. California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

307. The Trackers are also "trap and trace devices" under CIPA § 638.50(c) because they "capture the incoming electronic or other impulses that identify . . . dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication[.]" Cal. Penal Code § 638.50(c).

308. During the Class Period, Defendants installed the Trackers on the Website and used them to capture and transmit addressing information, including Plaintiff's and Class Members' IP addresses and other unique identifiers to Third Parties.

309. Plaintiff and Class Members did not provide their consent prior to Defendants' installation and use of the Trackers. On information and belief, Defendants also did not obtain a court order to install or use the Trackers.

310. Under California Penal Code § 637.2, Plaintiff and Class members have been injured by Defendants' violations of California Penal Code § 638.51(a), and each seeks statutory damages of $5,000 per violation.

311. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT XIV**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA")**
**18 U.S.C. §§ 2511(1),** *et seq.*
**(On Behalf of Plaintiff and the Classes)**

312.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

313.    The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

314.    The transmissions of Plaintiff's and Class Members' communications and/or Disclosed Information to Defendants' Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

315.    **Electronic Communications**. The transmission of communications or Disclosed Information between Plaintiff and Class Members and Defendants' Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

316.    **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

317.    **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(4), (8).

318.    **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning

of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendants' web-servers;

    d.  Defendants' Website; and

    e.  The Tracking Technology deployed by Defendants effectuated the sending and acquisition of visitors' communications.

319. By utilizing and embedding the Tracking Technology on the Website, Defendants intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

320. Specifically, Defendants intercepted Plaintiff's and Class Members' electronic communications via the Tracking Technology which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' communications or Disclosed Information to Third Parties.

321. Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding Disclosed Information. Specifically, HN shares information including but not limited to the text users type into a search bar with The Trade Desk and with Google. Plaintiff recalls using the search bar on the HN Website to search for treatment information and providers. HN shared the text of the searches entered with Third Parties.

322. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

323. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation

of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

324. **Unauthorized Purpose.** Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

325. Defendants intentionally used the wire or electronic communications to increase their profit margins and save on marketing costs.

326. Defendants specifically used Tracking Technology to track and to utilize Plaintiff's and Class Members' communications or Disclosed Information for financial gain.

327. Defendants were not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

328. Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy via the Tracking Technology.

329. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of their Website, Defendants' purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of HIPAA, the FTC Act, invading Plaintiff's and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

### COUNT XV
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. § 2511(3)(a)
### UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE
**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

330. Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

331. The ECPA statute provides that "a person or entity providing an electronic

communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

332.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendants' Website is an electronic communication service which provides to users thereof, customers of Defendants, the ability to send or receive electronic communications; in the absence of Defendants' Website, internet users could not send or receive communications regarding Plaintiff's and Class Members' Disclosed Information.

333.    **Intentional Divulgence**. Defendants intentionally embedded the Tracking Technology and were or should have been aware that, if so configured, it could divulge Plaintiff's and Class Members' communications or Disclosed Information. Upon information and belief, Defendants' divulgence of the contents of Plaintiff's and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.

334.    Defendants divulged the contents of Plaintiff's and Class Members' electronic communications without authorization and/or consent.

335.    Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding communications or Disclosed Information. Specifically, HN shares information including but not limited to the text users type into a search bar with at least The Trade Desk and with Google. Plaintiff used the search bar on the HN Website to search for treatment information and providers. HN shared the content of the searches with The Trade Desk and Google via the Trackers HN installed on The Website.

336.    **Exceptions do not apply**. In addition to the exception for communications

directly to an electronic communications service ("ECS")[42] or an agent of an ECS, the ECPA states that

> [a] person or entity providing electronic communication service to the public may divulge the contents of any such communication"…"as otherwise authorized in section 2511(2)(a) or 2517 of this title; "with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

U.S.C. § 2511(3)(b).

337.    Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

338.    Defendants' divulgence of the contents of Plaintiff's and Class Members' communications to Third Parties like Google and The Trade Desk were not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendants' service nor (ii) necessary to the protection of the rights or property of Defendants.

339.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

340.    Defendants' divulgence of the contents of Plaintiff's and the Class Members' communications on the Website through the Tracking Technology was not done "with the lawful consent of the originator or any addressee or intended recipient of such communication[s]." As alleged above: (i) Plaintiff and Class Members did not authorize Defendants to divulge the contents of their communications and (ii) Defendants did not procure the "lawful consent" from

---

[42] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

the Website or apps with which Plaintiff and Class Members were exchanging information.

341.    Moreover, Defendants divulged the contents of Plaintiff's and Class Members' communications through Tracking Technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

342.    The contents of Plaintiff's and Class Members' communications did not appear to pertain to the commission of a crime and Defendants did not divulge the contents of their communications to a law enforcement agency.

343.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment as follows:

A.    For an Order certifying this action as a Class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

C.    For an award of punitive damages, as allowable by law;

D.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' communications or Disclosed Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

E. For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendants owe a legal duty to their Website visitors to secure their communications or Disclosed Information and that Defendants violate this legal duty by disclosing visitors' communications or Disclosed Information to unaffiliated Third Parties;

F. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of communications or Disclosed Information compromised and unlawfully disclosed to Third Parties;

G. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

H. For an Order compelling Defendants to pay for not less than three years of credit monitoring services for Plaintiff and the Classes;

I. For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

J. Costs and any other expenses, including expert witness fees incurred by Plaintiff in connection with this action;

K. Pre- and post-judgment interest on any amounts awarded; and

L. Such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a trial by jury on all issues so triable.

Dated: May 5, 2026      Respectfully submitted,

_____

Natalie Lyons, No. 293026

CLASS ACTION COMPLAINT

Vess A. Miller, No. 278020
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
(317) 636-6481
nlyons@cohenmalad.com
vmiller@cohenmalad.com

Lesley E. Weaver (SBN 191305)
Anne K. Davis (SBN 267909)
STRANCH, JENNINGS & GARVEY, PLLC
1111 Broadway, Suite 300
Oakland, California 94607
(341) 217-0550
lweaver@stranchlaw.com
adavis@stranchlaw.com

Carly M. Roman, No. 349895
STRAUSS BORRELLI, PLLC
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
(872) 263-1100
(872) 263-1109 (facsimile)
croman@straussborrelli.com

*To seek admission *pro hac vice*

***Counsel for Plaintiff and the Proposed Classes***